Application for a Complaint by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>YASHICA SHEREA BAIN,<br><br>Defendant(s) | )<br>)<br>) Case No. 21-6152-Hunt<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __May 22, 2020 - August 14, 2020__ in the county of __Broward__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | | Offense Description |
|---|---|---|
| Wire Fraud | 18 U.S.C. §§ 1343, 2 | |
| Bank Fraud | 18 U.S.C. §§ 1344, 2 | |
| Conspiracy/attempt to commit wire fraud and bank fraud | 18 U.S.C. § 1349 | |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
Complainant's signature

SA Beatriz Feito, Special Agent, IRS-CI
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: __03/16/2021__

_____
Judge's signature

City and state: __Fort Lauderdale, Florida__    Hon. Patrick M. Hunt, United States Magistrate Judge
Printed name and title

## AFFIDAVIT

I, Beatriz Feito, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this Affidavit in support of a criminal complaint charging YASHICA SHEREA BAIN ("BAIN" or "Defendant"), with wire fraud, bank fraud, and attempt and conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. §§ 1343, 1344, 1349, and 2, from on or about May 22, 2020, to at least on or about August 14, 2020, in the Southern District of Florida, and elsewhere (the "Target Offenses").

2.      Defendant has participated in a conspiracy and scheme to obtain by fraud millions of dollars in forgivable loans through the Paycheck Protection Program ("PPP") and other government programs. Defendant committed the Target Offenses with a person now cooperating with the investigation ("CHS 2") and others. Defendant obtained a fraudulent PPP loan for her own company, Microblading Brow Studio, LLC ("MBS"), with CHS 2 providing falsified documents and submitting the application on Defendant's behalf in exchange for a kickback from the loan proceeds. To inflate the size of these PPP loans, and the corresponding kickbacks, the conspirators relied on a variety of false statements, including by submitting falsified bank statements and payroll tax forms. For example, the conspirators used nearly identical versions of the same fabricated bank statements, recycled in the PPP applications for multiple companies, with minor changes.

3.      The conspirators in the scheme planned or prepared at least 90 fraudulent applications, most of which were submitted. Based on the evidence investigators have reviewed to date, CHS 2, Defendant, and their co-conspirators applied for PPP loans that are together worth more than $34 million, with at least approximately 42 of those loans approved and funded for a

total of approximately $17.6 million. Certain of those loan recipients then wired a kickback of varying amounts, often approximately 25% of the fraudulent loan proceeds, to an account controlled by CHS 2.

4. I am a Special Agent with the United States Department of the Treasury, Internal Revenue Service, Criminal Investigation ("IRS-CI") and have been employed in this capacity since January 2019. I am presently assigned to the Miami Field Office. My duties as a Special Agent include the investigation of possible criminal violations of the Internal Revenue Code (Title 26 of the United States Code), the Bank Secrecy Act (Title 31 of the United States Code), and the Money Laundering Statutes (Title 18 of the United States Code). I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in May 2019 and the Special Agent Investigative Techniques program at the National Criminal Investigation Training Academy in August 2019. In these two programs, I studied a variety of law enforcement tactics and criminal investigator techniques relating to tax and financial crimes. Since becoming an IRS-CI Special Agent, I have personally investigated and assisted in investigations relating to the Internal Revenue Laws and financial crimes. Recently, I have been assigned to work with the U.S. Department of Justice and other law enforcement partners, including the Federal Bureau of Investigation and the Small Business Administration Office of Inspector General, to investigate possible fraud associated with the stimulus and economic assistance programs created by the federal government in response to the COVID-19 pandemic.

5. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other members of law enforcement and from witnesses.

This Affidavit is intended to show merely that there is sufficient probable cause and does not set forth all of my knowledge about this matter.[1]

## PROBABLE CAUSE

### *The Paycheck Protection Program*

6. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

7. In order to obtain a PPP loan, a qualifying business submitted a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application (Small Business Administration ("SBA") Form 2483), the small business (through its authorized representative) was required to provide, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation confirming their payroll expenses.

---

[1] The conduct and charges described in this Affidavit are part of a larger investigation that is being conducted in this District and elsewhere. As a result, not all numbered sources and anonymous individuals and entities are described in every filing. I have included in this Affidavit only those individuals and entities I have deemed necessary to explain the particular facts set forth here.

8.       A PPP loan application was processed by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies. While it was the participating lender that issued the PPP loan, the loan was 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

9.       PPP loan proceeds were required to be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time and used a defined portion of the PPP loan proceeds on payroll expenses.

***Financial Institutions***

10.       This Affidavit references financial institutions that are headquartered in the United States and insured by the Federal Deposit Insurance Corporation, including Bank 1, Bank 3, Bank 5, Bank 6, and Bank 7.

***The Scheme to Obtain Fraudulent PPP Loans***

11.       On or about May 13, 2020, Phillip J. Augustin ("Augustin") and CHS 2 worked together to submit a fraudulent PPP loan application on behalf of a company owned by Augustin. Augustin submitted a PPP loan of $84,515 to a federally insured bank (hereinafter "Bank 3"), through a third-party company processor (hereinafter "Bank Processor 1"). The application

included bank statements that are clear forgeries, and CHS 2 has admitted that the application was based on documents that he falsified for Augustin.[2]

12.     Following the success of that initial fraudulent PPP application, Augustin and CHS 2 began to work on obtaining more and larger PPP loans for Augustin's associates and others, generally for several hundred thousand dollars for each loan, up to as much as approximately $1.24 million. Based on the evidence investigators have reviewed so far, CHS 2 and Augustin collectively coordinated applications for PPP loans that are together worth more than $34 million dollars. The evidence also shows many more PPP loans were attempted but rejected by banks or their partners, or were planned and prepared, but not submitted before CHS 2's arrest. The evidence suggests that all or nearly all of those loan applications were fraudulent, including Defendant's loan application.

13.     Investigators have obtained many other PPP loan applications that CHS 2 has admitted he submitted as part of this scheme, based on falsified documents, and have also obtained draft documents used or intended to be used in those applications or others. These applications all follow the same pattern of fraud—many with obviously counterfeit February 2020 bank statements, and all with fabricated IRS Forms 941 (titled, "Employer's Quarterly Federal Tax Return") with the same indicia of fraud found in Augustin's initial application—but generally with

---

[2]     On June 25, 2020, investigators arrested CHS 2 and another person now cooperating with the investigation ("CHS 3") and executed search warrants at their residences. Following his arrest, CHS 2 chose to cooperate with the investigation in the hope of obtaining favorable consideration in connection with his pending charges. CHS 2 was interviewed on that day, and has continued to cooperate with the investigation after obtaining counsel. Most of his statements related herein have been corroborated by records obtained from third parties or recovered from his electronic devices.

even larger inflated payroll numbers, thus yielding much larger loans.[3] CHS 2 has explained to investigators that the figures in the Forms 941 were the product of a formula that allowed him to start with a target loan amount, and then "back into" the payroll figures on the form. He explained how he used figures that would produce an average monthly payroll for 2019 that, when multiplied by 2.5, would yield the requested loan amount. In turn, the number of employees reported was chosen based on fictional payroll figures, chosen to avoid an average employee salary that might raise suspicion.

14. CHS 2 has also explained that he tried to use bank statements showing that the company had a large balance. Because so few companies had such a statement, and likely also because it was easier than keeping track of their true statements, CHS 2 repeatedly submitted near-replicas of the same falsified bank statements. In particular, CHS 2 appears to have recycled one statement each from Bank 1, Bank 6, and Bank 7. In recycling a statement, CHS 2 generally changed only the account number and the account holder's name and address, such that each version of the statement had identical figures and line items throughout the statement.

15. A review of records for bank accounts controlled by CHS 2 at Bank 5 confirmed CHS 2's admissions that he received numerous kickbacks, often of approximately 25% of the amount of the loans, and that he regularly wired Augustin a share of that kickback in the early stages of the scheme. CHS 2 explained that they were doing so many loans by the end of May that he changed course, instead wiring larger lump sums, collecting Augustin's shares of the kickbacks for multiple loans in one wire.

---

[3] Some loan applications also included voided checks that appear to be falsified, such as a purported check from a bank ("Bank 5") that appears to have been produced on a computer and, as the subject line of an email transmitting the voided check read, "Converted to PDF[,]" rather than a scan of an authentic check.

16. Investigators are still receiving and analyzing records, but based on a preliminary analysis, as of August 31, 2020, investigators had identified a total of approximately $2,367,765.82 in transfers to CHS 2's accounts from entities that each obtained a sizable PPP loan and that were identified in the PPP files seized from CHS 2's and another co-conspirator's residences, as described below—or from individuals associated with those entities.

17. The PPP loans identified above as implicated in the foregoing kickback payments to CHS 2 represent only a fraction of the overall scheme. In executing search warrants at the respective residences of CHS 2 and CHS 3, federal agents found stacks of paper printed out and organized by entity, containing an "intake form," fabricated Forms 941, or both for each entity. The intake forms contained fields for the information needed to fabricate the documents and fill out other aspects of the PPP application: identifying information about the owner and company, as well as bank account information for receiving the loan. A section at the end marked "BELOW IS OFFICE USE ONLY" included blank fields for the "Number of Employees[,]" "Monthly Payroll Expense[,]" and "SBA Loan Pre-Approval Amount." Between CHS 2's and CHS 3's residences, investigators seized paper files for PPP loan applications for approximately 80 different entities.

18. Data obtained from the SBA showed additional PPP loan applications from additional entities that text message and email records show had been referred to CHS 2 by members of the conspiracy.

### *The Fraudulent PPP Loan Disbursed to MBS*

19. According to Florida's Division of Corporations website ("Sunbiz"), MBS was established as a Florida limited liability company on or about February 9, 2017; BAIN is listed as one of the company's two managers and as the registered agent; and the principal address of MBS is 2501 S.W. 101st Avenue, Unit #106, Miramar, Florida 33025.

20. On or about May 23, 2020, a PPP loan application and supporting documents on behalf of MBS were electronically submitted, via interstate wire, to Bank 3 through Bank Processor 1. The loan application package included, among other documents: (1) four purported Forms 941 for each quarter of 2019 in the name of MBS; (2) a purported company bank statement for MBS from Bank 6; and (3) a Borrower Application Form for a PPP loan request of $415,232 for MBS based upon a purported average monthly payroll of $166,093 for 21 employees (the "PPP Application Form").[4]

21. The purported Forms 941 submitted with MBS's PPP loan application package show quarterly payroll of over $300,000 each quarter, and do not state the number of employees who were paid wages. That quarterly payroll figure yielded the PPP loan application's "Average Monthly Payroll" figure of $166,093, which determined the $415,232 amount of the loan. Each Form 941 was signed by hand with the name "Yashica Bain" as the company owner, and also listed "Yashica Bain" as the company's designee and as a "Paid Preparer," although BAIN is not a paid tax preparer.[5]

22. The purported Forms 941 submitted with MBS's PPP loan application package follow the same style and pattern, including the indicia of fraud, as the many other Forms 941 that CHS 2 acknowledged that he helped create and submit in the course of the scheme, as described

---

[4] The PPP Application Form listed BAIN as the 100% owner of MBS, and also listed BAIN's address as located in Miami, Florida.

[5] CHS 2 admitted during interviews with law enforcement that CHS 2 signed many of the Forms 941 included in the PPP applications. When CHS 2 was shown the four Forms 941 for MBS, CHS 2 admitted that he signed all of them.

above.[6] Moreover, IRS records show that MBS did not, in fact, file any Forms 941 for any quarter of 2019 or the first quarter of 2020, and Florida Department of Revenue records show that MBS did not report any wages or employees for that same period.

23. The purported company bank statement for MBS submitted with its PPP loan application package, which was submitted in electronic format as a PDF, has indicia of forgery. According to the PDF file "properties," the February 2020 statement was created using "PDFFILLER," a program used to edit electronic PDF files, and was "modified using iText." The metadata shows that the file was created on May 14, 2020, and modified on May 23, 2020. Further, the statement is a recycled version of the same falsified Bank 6 statement used in other fraudulent applications submitted as part of this scheme.

24. The PPP Application Form required the borrower to electronically initial and/or sign (via DocuSign, as explained below) a number of "certifications," including: (1) that the applicant business was in operation on February 15, 2020, and had employees to whom it paid salaries/payroll taxes or paid independent contractors, as reported on Form(s) 1099; (2) that the funds would be used to retain workers, maintain payroll, or make mortgage/interest/lease/utility

---

[6] As noted above, BAIN was listed as both owner and paid preparer. Dozens of other Forms 941 submitted in this scheme evidence the same error. CHS 2 has admitted that these documents share that feature because he misunderstood the form, and he (or someone following his instructions) prepared the Forms 941 at issue. The content of the forms also indicate falsification. MBS submitted four identical 941s, down to the penny in reported figures. They also evidence a pattern of payroll spending that is likely false: each of the quarters shows significant (but identical quarter over quarter) increases from the first to second to third month of the quarter. For each identical form, the same figures are reported for the tax liability incurred in the first month of each quarter, the same figure for the second month of each quarter (increased substantially from the first month), and the same figure for the third month of the quarter (increased substantially from the second month). The result is that the company reports a perfectly repeating cycle of ascending payroll costs within each quarter. CHS 2 has explained that this was due to a formula he used, allocating different percentages of the quarterly payroll tax liability to each month of each quarter.

payments as specified by the PPP rule and that unauthorized use could result in charges for fraud; and (3) that the information provided in the application, including in supporting documents, was "true and accurate in all material respects," and that making false statements could result in criminal charges. Each certification was electronically initialed "YB," the loan application was electronically signed, and the printed name on the loan application was "Yashica Bain[.]"

25. The promissory note, labeled at the top "Paycheck Protection Program Loan[,]" set forth the amount of the loan ($415,232) and its terms (including that the proceeds could only be used for business purposes). The terms also specified that the borrower may apply for loan forgiveness only in an amount equal to the sum of certain specified costs: payroll costs, interest on mortgage obligations, rent obligations, and utility payments. The promissory note further specified that not more than 25% of the amount of forgiveness could be attributable to non-payroll costs. Additionally, the promissory note contained a "Representations and Warranties" section for the borrower to acknowledge, among other things, that "the information provided in all supporting documents and forms to obtain this loan" were true and accurate. The promissory note was electronically signed and the printed name on the promissory note was "Yashica Bain[.]"

26. Bank Processor 1's Internet protocol ("IP") address records for the MBS loan application show that a computer with an IP address (ending in 170) associated with CHS 2's residence in Broward County, Florida, logged into the MBS loan account on or about May 23, 2020, May 26, 2020, May 28, 2020, June 2, 2020, and on June 8, 2020. The session records also reveal that a computer with IP address (ending in 99), an IP address used to access BAIN's email account ("browpalace954@gmail.com"), logged into the MBS loan account to view and sign the PPP loan application on or about May 23, 2020. Subsequently, on or about May 23, 2020, a computer with IP address (ending in 205), associated with a business in Miramar, Florida, which

was located next door to MBS, logged into the MBS loan account to view the PPP loan application. I interviewed the owner of this business, and the owner stated that he/she knows BAIN, that BAIN visits the business, and that BAIN could have obtained the password to the business' internet wireless network sometime in the last two years.

27.  Records received from DocuSign indicated that, on or about May 23, 2020, at 11:57 a.m. (UTC), Bank Processor 1 sent the PPP Application Form to the DocuSign user "Yashica Bain" at the email address "browpalace954@gmail.com." Records obtained from Google and T-Mobile indicated that the phone number associated with this email account was BAIN's phone number.[7] BAIN also provided the email address "browpalace954@gmail.com" to a co-conspirator who has separately been charged as part of the scheme, Keyaira Bostic ("Bostic"),[8] via text message when BAIN was applying for the PPP loan on behalf of her company MBS.

28.  Based upon these records from DocuSign, Google, and T-Mobile, BAIN viewed the PPP Application Form on or about May 23, 2020, at 11:58 a.m. (UTC), and BAIN signed the PPP Application Form on or about May 23, 2020, at 11:59 a.m. (UTC) via a mobile device using an IP address ending in 99.[9]

---

[7]  In addition, according to T-Mobile records, the subscriber address for BAIN's phone number is a residential and mailing address located in Miami, Florida, which is also listed on BAIN's Florida Driver's License.

[8]  On December 8, 2020, Bostic was indicted in the Southern District of Florida with wire fraud, bank fraud, and conspiracy to commit wire fraud and bank fraud for her role in this scheme. *See* Case No. 20-cr-60139-WPD.

[9]  As mentioned in paragraph 21, this IP address (ending in 99) is the same IP address used by a computer on or about May 23, 2020, to connect to BAIN's email account. In addition, the DocuSign records reflect that the electronic signature adopted for the loan was "drawn on device," which indicates that the adopted signature was manually drawn by the signer. The other option available would have been to select one of the predefined styles from the DocuSign program,

29. Based on the representations made in the loan application paperwork and supporting documents, the PPP loan application for MBS was approved, and on or about June 23, 2020, Bank 3 wired approximately $415,232.00 in loan proceeds into the MBS bank account at Bank 4.

*__Emails, Text Messages and Bank Records Confirm BAIN's Knowing Participation in the Fraud__*

30. As part of the investigation, law enforcement obtained communications between Bostic and BAIN, and between Bostic and CHS 2, including text messages and emails. I have reviewed a number of these communications, which discussed, among other things, the PPP loan for MBS. These communications occurred between on or about May 22, 2020, and on or about June 26, 2020. Bostic communicated with BAIN at BAIN's phone number, 954-668-6263, the same phone number associated with MBS.

31. I have also reviewed Bank 4 records for MBS and Bank 5 records for a company controlled by CHS 2, which confirmed BAIN's receipt of the MBS PPP loan proceeds and the subsequent kickback payment to CHS 2. Bank records show that MBS had an account at Bank 4 ending in *7820 ("Bank 4 *7820"). A signature card for the Bank 4 *7820 account shows that BAIN opened the account on or about November 14, 2017, listed her position as "signer," and was one of two authorized signers for the account.[10] On or about June 23, 2020, the Bank 4 *7820 account received via bank wire approximately $415,232 in loan proceeds from Bank 3 as a result of MBS's fraudulent PPP loan application.

32. Text messages and emails between BAIN and Bostic show how they exchanged

---

which would then populate the signature line with the "pre-selected style." The DocuSign signature on the loan application appears to match the style of BAIN's DAVID signature.

[10] The other authorized signer was Angela Sherea Perriman-Wright. The investigation has revealed that she is BAIN's mother.

information in order for BAIN to apply for a PPP loan. On or about May 21, 2020, Bostic sent a text message to BAIN, which stated, "Send me your email I will send the intake sheet." In response, BAIN sent Bostic the email address "browpalace954@gmail.com." Subsequently, on or about May 21, 2020, Bostic emailed BAIN at "browpalace954@gmail.com" an intake sheet. As explained above, the intake forms contained fields for the information needed to fabricate the documents and fill out other aspects of the PPP application: identifying information about the owner and company, as well as bank account information for receiving the loan. A section at the end marked "BELOW IS OFFICE USE ONLY" included blank fields for the "Number of Employees," "Monthly Payroll Expense," and "SBA Loan Pre-Approval Amount."

33. On or about May 21, 2020, BAIN, using email address "browpalace954@gmail.com," sent Bostic an "application" and a February bank statement. Subsequently, on or about May 23, 2020, Bostic forwarded these documents to CHS 2.

34. A review of the text messages between BAIN and Bostic show that BAIN was considering using BAIN's mother's information to apply for the PPP loan because BAIN was concerned about BAIN's credit score. On or about May 22, 2020, BAIN sent a text message to Bostic that stated, "If they go by credit I may have to change the name to my moms because my Equifax won't move." Bostic replied, "Credit doesn't matter My home credit was in the 300s." BAIN then responded, "My shit is 730 but my Equifax is fucked. 600." Bostic replied to BAIN, "They don't check credit," to which BAIN responded, "Ok cool."

35. A review of the text messages between BAIN and Bostic also show that they discussed the arrest of an individual accused of committing fraud in connection with a PPP loan. On or about May 24, 2020, the day after BAIN applied for the MBS PPP loan, Bostic sent BAIN a link to a news article that discussed the arrest of an Atlanta reality TV star accused of committing

fraud in connection with a PPP loan (a little over $2 million) that he obtained in the name of his company. BAIN replied, "Ok." Bostic then sent a text message to BAIN that stated, "This is buddy what he did and the amount was a huge red flag."

36. BAIN and Bostic also discussed, via text messages, the 25% kickback payment to CHS 2. On or about June 24, 2020, after Bostic had received the PPP loan proceeds, Bostic forwarded to BAIN a text message that CHS 2 had sent Bostic. The text message read as follows: "Kay I heard back from blue vine they said they approved her and that the funds are hers to use. Tell her make sure the funds are available before she tries to use it Tell her to send us our 25% lol But she is ok to use I have the forgiveness paperwork and I Am getting it ready for distribution for everyone to sign do I can work on it for them." Subsequently, on or about June 25, 2020, Bostic sent BAIN the wire instructions for the kickback payment to CHS 2. The wire instructions included CHS 2's bank name, company name, home address, account number, and routing number. BAIN was supposed to follow these instructions in order to wire approximately 25% of MBS's PPP loan to an account CHS 2 controlled at Bank 5. Bostic then sent a follow-up text message to BAIN that stated, "He said to put in the notes remodeling for the salon."

37. BAIN's bank records confirmed that BAIN followed these instructions and wired part of the kickback payment to CHS 2. A review of BAIN's bank records showed that on or about June 25, 2020, BAIN wired approximately $28,800 to CHS 2. BAIN wired this money from her Bank 4 *7820 account to an account controlled by CHS 2 at Bank 5. The memo line for the wire indicated it was for "For Microblading Brow Studio/ remodeling salon." However, CHS 2 did not perform or agree to perform any business upgrading services for BAIN.

38. Subsequently, BAIN sent a confirmation text to Bostic that stated, "Hey boo, I sent 28,800." Bostic replied, "Ok," and then wrote, "He said u can do the rest in cash," to which BAIN

replied, "Ok that's the plans."

39.    A review of BAIN's bank records show that after BAIN received the PPP loan proceeds, BAIN made substantial payments to herself and to other individuals that purported to be for payroll expenses. For example, on or about June 30, 2020, BAIN wired herself $48,600. The memo line for this wire indicated it was for "back pay wages." On or about July 8, 2020, BAIN wired $50,000 to her boyfriend. The memo line for this wire indicated it was to "take care of payroll." On or about July 9, 2020, BAIN's boyfriend received an additional payment of $2,500 from MBS via Zelle for "wages." On or about October 5, 2020, I interviewed BAIN regarding her PPP loan for MBS. This interview was consensual. Among other things, BAIN stated that this individual was her boyfriend. BAIN initially said that MBS did not have more than 16 employees at any one time (in contrast to the 21 employees claimed on the PPP loan application, as described above). After further questioning, BAIN could not provide names of employees and further said the employees came and went frequently. She also claimed that MBS had roughly eight or nine employees in February 2020, and that it had zero or very few employees in March 2020, but she could not recall the exact number.

40.    On or about July 10, 2020, BAIN wrote herself a check in the amount of $8,500 for "wages." From on or about June 26, 2020, through on or about August 14, 2020, BAIN wrote "wages" and "payroll" checks totaling approximately $77,020 and made payable to different individuals, including herself. For example, on or about July 3, 2020, BAIN wrote a $3,000 check to an individual and the memo line indicated it was for "payroll/wages." I interviewed this individual, who stated that he/she did not know BAIN or MBS; that he/she has never worked for BAIN or MBS; and that he/she received this check from a friend who asked him/her to please cash

the check.

41.     On or about July 31, 2020, BAIN wrote a $5,250 check to another individual and the memo line indicated it was for "wages/payroll." I interviewed this individual, who stated that he/she did not know BAIN or MBS; that he/she has never worked for BAIN or MBS; and that he/she received this check from someone else in order to help with his/her school payment. A review of BAIN's bank records does not show that BAIN personally received or paid these amounts of wages prior to the date when she obtained the PPP loan. Further, as previously described, IRS records show that MBS did not, in fact, file any Forms 941 for any quarter of 2019 or the first quarter of 2020, and Florida Department of Revenue records show that MBS did not report any wages or employees for that same period.

42.     BAIN's bank records also show that BAIN made substantial payments to MBS and failed to use this money on business-related or payroll-related expenses for MBS. For example, on or about July 13, 2020, she transferred approximately $65,000 from Bank 4 *7820 account to another bank account in the name of MBS. Subsequently, approximately $53,503 was withdrawn from this other MBS account and a cashier's check for $8,000 was made payable to Midtown Lounge 55, a bar and lounge in Miami, Florida. Law enforcement agents interviewed the individual familiar with the $8,000 cashier's check, and this individual stated that BAIN paid her/him this money in order to purchase Midtown Lounge 55.

[THIS SPACE INTENTIONALLY LEFT BLANK]

## CONCLUSION

43. Based on the forgoing, I respectfully submit that there is probable cause to believe that YASHICA SHEREA BAIN committed the Target Offenses, from on or about May 22, 2020, to at least on or about August 14, 2020, in the Southern District of Florida, and elsewhere.

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

Beatriz Feito
Special Agent
IRS-CI

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, on this \_\_\_ day of March, 2021, at Fort Lauderdale, Florida.

HONORABLE PATRICK M. HUNT
UNITED STATES MAGISTRATE JUDGE